The Honorable John Paul Verkamp State Representative 1405 W. Center Street Greenwood, AR 72936-3405
Dear Representative Verkamp:
I am writing in response to your request for my opinion on the following two questions:
 1. Does ACA 14-235-305 compel a property owner to bear a proportional expense of extending the City's sewer system to his property? If not, what does it mean?
 2. If the City, using its own funds, extends the sewer system to certain properties, must each property owner pay a proportional share of the cost of the extension when he taps the City's sewer line?
You have reported the following factual background:
 I am once again writing in regards to Opinion No. 2003-068, wherein no reference is made to A.C.A. § 14-235-305, which states that "No person shall be allowed to tap any sewer without paying in proportion to the value of his property to be benefited by it, as compared with the value of the property taxed in the district and the actual cost of the sewer." This law appears to contradict the statement in the opinion that "No principle of constitutional or statutory law dictates that landowners be charged their proportional share of the cost of constructing sewer trunk lines that service their property."
 Following the guidance of contracted engineers, the legal staff of the Arkansas Municipal League, and its understanding of A.C.A. § 14-235-305, the City of Greenwood has always required that property owners bear the expense of extending the City's sewer system to their properties. The City has required this of both individuals and developers. In some cases, individuals have come together to form sewer improvement districts to obtain financing for sewer projects. In others, property owners have simply paid the total cost of running a sewer line from their individual property through easements to the nearest existing sewer line. Developers have been responsible for installing sewer lines and related systems in accordance with the City's subdivision ordinance.
 There are properties in the city that use septic systems for the disposal of wastewater. In one area of the City, the Health Department has prohibited the construction of new homes because soil conditions prevent the proper functioning of septic systems. Some property owners want the sewer system to be extended to their properties. In some cases, the availability of sewer services will permit the use of previously undeveloped land for high-density residential purposes.
 In most cases, there are existing sewer collection lines in close proximity to the properties in question. New collection lines will have be constructed from the existing lines to those properties for which sewer service is desired.
RESPONSE
With respect to your first question, I believe A.C.A. § 14-235-305 only compels homeowners who voluntarily tap into an existing city sewer system to pay their proportional share of the system's initial construction cost. It does not address the issue of financing the initial cost of construction, which is the question I addressed in Opinion No. 2003-068. I am unaware of any statutory or constitutional provision that would empower a city to compel adjacent property owners to tie into a municipal sewer system unless health concerns dictated doing so. With respect to your second question, I believe only property owners who elect without compulsion to tap into the system may be charged for their proportional share of the initial capital construction. Moreover, I believe this charge should be for their proportional share of constructing the entire system, not merely the extension.
Question 1: Does ACA 14-235-305 compel a property owner to bear aproportional expense of extending the City's sewer system to his property?If not, what does it mean?
You question my conclusion in Opinion No. 2003-068 that a city cannot finance the initial construction of a sewer extension by requiring all property owners along its path to contribute proportionately to the cost of the extension. I continue to believe that a city cannot impose such charges as a means of financing initial capital construction.
The Code specifically addresses the construction of municipal sewage systems at A.C.A. § 14-235-201 et seq. (Repl. 1998 Supp. 2001). Subsection 14-235-203(c)(1) provides that every municipality may "own, acquire, construct, equip, operate, and maintain" a sewer system "within or without the corporate limits of the city or town." Subsection14-235-203(c)(1) affords all municipalities jurisdiction up to ten miles outside their corporate limits. Subsection 14-235-204(a) confirms this authority and further authorizes the issuance of bonds to finance sewer construction. Subsection 14-235-215(a)(2)(A)(i) provides:
 Funds for the payment of the entire cost of the works and for the payment of any extraordinary expenses or liabilities arising from the ownership and operation of the works including, without limitation, liabilities to customers of the works relating to rates charged by the municipality for use of the works shall be provided by funds derived from the operation of the works, by funds of the municipality appropriated for that purpose, and by the issuance of municipal revenue bonds, the principal and interest of which shall be payable solely from the special fund provided in § 14-235-221 for payment.
Finally, A.C.A. § 14-235-204(b) conditions a city's grant of authority over sewers by providing that "all functions, powers, and duties of the State Board of Health shall remain unaffected by this subchapter."
With respect to the issue of mandatory hookups, A.C.A. § 14-235-302(a) provides:
 After the completion of any sewer or branch sewer authorized to be built under the provisions of this act, it shall be lawful for the board of health of any municipality to which this act is applicable, whenever, in their opinion, the public health will be promoted by it, to order any one (1) or more property owners near or adjacent to any sewer to construct upon their property sewers leading from some point or place on their premises to the sewer of the municipality. . . .
(Emphasis added.) A city is consequently authorized to mandate hooking up to a municipal sewage system constructed under the act only when the public health dictates. Moreover, this authority is qualified by A.C.A. §14-235-304, which prohibits a municipal board of health from ordering or compelling anyone to construct a hookup running more than 300 feet from his property. Any refusal to hook up within this prescribed distance is a misdemeanor. A.C.A. § 14-235-301(a)(1).
The scope of a city's power to compel landowners to hook up to a city sewer system was at issue in Jernigan v. Harris, 187 Ark. 705,62 S.W.2d 5 (1933). The court in Jernigan offered the following analysis:
 It may be first said that the power of cities and towns to install sewage systems and waterworks is universally recognized. The health, as well as the comfort and convenience of persons living together in close relation and in large numbers require the existence of such powers, and a sewage system would be valueless unless the power inhered to require all property owners to make physical connections with the sewers.
187 Ark. at 709. Although the court referred in this passage to a city's inherent power "to require all property owners to make physical connections with the sewers," the passage further appears to acknowledge that that power must be exercised only in pursuit of "[t]he health, as well as the comfort and convenience of persons living together in close relation and in large numbers." This impression is confirmed in the court's discussion immediately following the passage just quoted:
 The existence of this power was clearly recognized in the case of Dinning v. Moore, 90 Ark. 5, 117 S.W. 777. That was a suit under § 5525, Kirby's Digest (now appearing as § 7993, Crawford and Moses' Digest [now A.C.A. § 14-235-302, empowering a board of health to compel connection if the public health requires it]), which provides that the board of health of any city may direct property owners to make connections with adjacent sewers, with a provision that, upon their failure to make such connection, it shall be the duty of the board of health to have it made and to charge the property therewith, and to enforce payment of the cost thereof against the property by a suit in the chancery court.
187 Ark. at 709.
In City Of Mountain Home v. Ray, 223 Ark. 553, 557-58, 267 S.W.2d 503
(1954), the court further explored the relationship between the statutory power to compel hooking up to a sewer under certain circumstances and the general police power, now codified at A.C.A. § 14-55-102, which provides:
 Municipal corporations shall have power to make and publish bylaws and ordinances, not inconsistent with the laws of this state, which, as to them, shall seem necessary to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of such corporations and the inhabitants thereof.
The court in Ray offered the following analysis:
 Appellant's argument is that 27 of the ordinance is constitutional,[1]
but irrespective of the ordinance, or of Act 132, cities have inherent power to compel obedience to sanitary and health regulations. In Branch v. Gerlach, 94 Ark. 378, 127 S.W. 451, it was held that an ordinance requiring a separate sewer connection for each lot was reasonable and that the city's right came from its police power — control of sewer connections having been conferred by Kirby's Digest, 5722 et seq. (now Ark. Stat's, 19-4125 [now A.C.A. § 14-235-302]). It was said in Freeman v. Jones, 189 Ark. 815, 75 S.W.2d 226, that reasonable charges may be imposed upon owners of property connected with a city sewer system.
 Issues raised in Jernigan v. Harris, 187 Ark. 705, 62 S.W.2d 5, were discussed by Judge Frank G. Smith. In holding Act 132 constitutional as against enumerated points of attack, it was said that the power of cities and towns to install sewage systems and waterworks is universally recognized. . . .
 The rule deducible from the Jernigan-Harris case, however, seems to be that either a city board of health or some constituted health authority must ascertain that existing facilities are inadequate and that the public health is impaired before criminal proceedings may be prosecuted.[2] It follows that punishment must rest upon a factual background upon which prosecution for an act tending to imperil public health is shown.
(Emphasis added.)
The passage just quoted is somewhat confusing in its paraphrase of the court's ruling in Branch. The court in that case did not rule that a city might simply issue a blanket decree that any lot adjoining a city sewer must tie into the sewer, regardless of whether the public health would be served thereby. Rather, the court only affirmed as "a reasonable exercise of the police power" an ordinance mandating that "any residence, shop or place of business" electing to tie into the sewer must make a separate connection to the main and pay a separate fee. 94 Ark. at 378. Implicit in this ruling is a recognition that a property owner whose residence or business does not threaten the public health need not hook up to a municipal sewer. The court expressly justified its ruling requiring separate elective connections in terms of public health, noting that the ordinance was enacted "so that the supervision may be more effective, and so that the stoppage of one connection will not affect other premises."[3]
Accordingly, with respect to the application of both the police power and of Act 84 of 1881, I believe the language highlighted from Ray above accurately states the law. I do not believe a city may mandate hooking up to a city sewer system unless some public health or welfare interest supports imposing the requirement and only then if the hookup will not extend farther than 300 feet.
Section 14-235-305 of the Code, which you interpret as inconsistent with my previous opinion, provides in its entirety:
 (a) The city council shall regulate, by ordinance, the terms, time, and manner, and the compensation which shall be paid by the private parties not building sewers under orders of the municipal board of health under this act, upon compliance with which the parties may tap the sewers of the municipality.
 (b) No person shall be allowed to tap any sewer without paying in proportion to the value of his property to be benefited by it, as compared with the value of the property taxed in the district and the actual cost of the sewer.
On its face, this statute would appear to do no more than provide thatif a property owner has not been ordered to connect to the system by the board of health (or, according to Ray, some other qualified health authority), he may tap onto the system only if he pays his proportional share of the cost of construction. This authorization is a far cry from a legislative mandate that all property owners adjoining an extended line contribute to the cost of the line's extension. On the contrary, the use of the words "may tap the sewers of the municipality" would appear to acknowledge that a homeowner who is using a septic system in compliance with state and local law may continue to do so notwithstanding the possible extension to his property of municipal sewer lines. See Ark. Op. Att'y Gen. No. 2001-324 (addressing a property owner's right to maintain a private septic system so long as it complies with the Arkansas Sewage Disposal Systems Act, A.C.A. § 14-236-101 et seq.). Section 14-235-305
further suggests that any tapping landowner's proportional contribution to construction costs will not occur unless and until he elects to tap into the system — a fact that renders such contributions practically unavailable to finance the initial construction, which I interpreted as being the issue in Opinion 2003-068. Accordingly, I consider it an accurate statement of law to opine that a city cannot dictate that property owners who might in theory benefit from a sewer line extension be charged their proportional share of its costs in order to finance the construction itself.
My interpretation of this statute appears to draw support from its legislative history. Section 18 of Act 84 of 1881 provided, inter alia,
that a municipal board of health, if "the public health will be promoted thereby," might require a property owner at his own expense to tie into a municipal sewer "for the purpose of draining off surface or other water, and for the purpose of conducting any excrement that may be at or about such premises, and filth of every nature, character and description." The legislation conditioned this right by providing that a city could not mandate a hookup if the property owner would have to construct a connection longer than 300 feet. Act 84 at no point suggested that an individual or business directed to tie into a sewer line would be charged proportionally for the cost of the line's initial capital construction. The legislation failed entirely to address the issue of elective hookups.
The legislation currently codified at A.C.A. § 14-235-305 was enacted as Act 18 of 1889, § 4, which provided:
 That section 877 of Mansfield's Digest shall be amended so as to read as follows: "The City Council shall regulate by ordinance, the terms, time and manner, and the compensation which shall be paid by the private parties not building sewers under the orders of the Board of Health, upon compliance with which said parties may tap the sewers of said city; but no person shall be allowed to tap any such sewer without paying in proportion to the value of his property to be benefited thereby, as compared with the value of the property taxed in the district and the actual cost of said sewers."
(Emphasis added.) The highlighted language, which is reproduced almost verbatim in A.C.A. § 14-235-305, clearly suggests that the legislature intended to impose pro-rata liability for the cost of initial capital construction only upon those who voluntarily chose to tie into the system, not upon those who had been ordered to do so by the board of health.[4]
In summary, I do not believe that the Code authorizes a city to require property owners to hook up to a municipal sewage system for reasons that do not implicate public health. Subsection 14-235-223(b) of the Code provides that users of the system may be charged rates for service and that "[t]he rates or charges shall be sufficient in each year for the payment of the proper and reasonable expense of operation, repair, replacements, and maintenance of the works and for the payment of the sums required in this subchapter to be paid into the sinking fund." The purpose of the sinking fund is to retire the bonds issued to finance construction of the system. A.C.A. § 14-235-223. With respect to the issue of financing the cost of the works themselves, A.C.A. §14-235-215(a)(2)(A)(i) is unequivocal in declaring that the sources of such funding will be rates charged for service, municipal funds, revenue bonds or revenue notes. The only provision I know of that would obligate a user to pay his proportional share of the capital expenditure devoted to initial construction of the system is A.C.A. § 14-235-305, which I read as applying only to users who voluntarily and without compulsion tap into the system after its construction.
I am neither equipped nor authorized to opine how a court might apply the foregoing principles of law to the factual background you have recited. You report, inter alia, that the Health Department has prohibited additional construction in certain areas that might support high-density residential construction if served by city sewer lines. A court faced with the issue might conclude that conditioning additional construction upon tying into the system amounts to mandating hookups for public health reasons, thus precluding the city from charging affected property owners with their proportional shares of the cost of capital construction. Alternatively, given that an owner of undeveloped property is in no sense obligated to build in the first place, a court might characterize a property owner's acceptance of such a conditional building authorization as a voluntary agreement by the owner to tie into the system, thus obligating the owners to pay their proportional share of the system's construction pursuant to A.C.A. § 14-235-305. However, even if a court were to endorse the latter position, I do not believe the funds would be available to finance initial construction of the extension; at most, they might be used to service bond debt.
Finally, I will note that the legislation on this question is both old and confusing. For instance, in contravention of what I believe a close reading of the law would support, the court in Bennett v. City of Hope,204 Ark. 147, 161 S.W.2d 186 (1942), speculated in dictum that a city for any or no reason might compel hookups of all dwellings within 300 feet of a sewer line, although the court at no point suggested that the individuals thus compelled to hook up could be charged with the capital cost of constructing the line. I believe the confusion on such issues reflects a lack of clarity in the pertinent legislation, which would benefit from legislative review in light of modern conditions.
Question 2: If the City, using its own funds, extends the sewer system tocertain properties, must each property owner pay a proportional share ofthe cost of the extension when he taps the City's sewer line?
As reflected in my response to your previous question, I do not believe any property owner who is compelled to tap into the system for reasons of public health may be charged a proportional share of constructing all or part of the system. With respect to a property owner voluntarily tapping into the system, A.C.A. § 14-235-305(b) provides that the new user shall be charged "in proportion to the value of his property to be benefited by it, as compared with the value of the property taxed in the district and the actual cost of the sewer." In Sloss v. Turner, 175 Ark. 994,1001-02, 1 S.W.2d 993 (1928), the court declared that this calculation should entail figuring the new user's proportional share of the cost of the entire system, not merely the extension.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] The referenced section 27 of the ordinance mandated that houses within 200 feet of the sewer hook up to the system.
[2] Act 84 of 1881, § 18 rendered it a misdemeanor to refuse to hook up to a sewer if the board of health ordered doing so. See A.C.A. §14-235-301(a)(1). The court's reference in the alternative to "either a city board of health or some constituted health authority" may be significant in light of the fact that few, if any, cities today have boards of health. It appears that city councils, presumably based on consultation with experts, normally make direct decisions regarding the public health need to make sewer connections.
[3] I will further note that the precedential value of Branch, which issued in 1910, would be questionable even if the court had concluded that a city's police power might warrant the city in simply requiring all residents, for any or no reason, to hook up to a municipal sewer system. The legislature afforded cities the general police power pursuant to Act 1 of 1875 (currently codified at A.C.A. § 14-55-102). The statutory provisions regarding mandatory and permissive hookups to city sewers were enacted pursuant to Act 84 of 1881, § 18, as amended by Act 18 of 1889, § 4. Assuming Act 1 of 1875 accorded a broader power to mandate sewer hookups than Act 84 of 1881, as amended, which conditioned mandating hookups upon a finding that public health concerns warranted the mandate, I believe the latter legislation would control. When two legislative enactments are in such irreconcilable conflict that both cannot stand together, the conflicting provisions of one are repealed by implication by the other. Donoho v. Donoho, 318 Ark. 637, 887 S.W.2d 290
(1994); Ward School Bus Mfg., Inc. v. Fowler, 261 Ark. 100,547 S.W.2d 394 (1977). Ordinarily, the provisions of an act adopted later in time repeal the conflicting provisions of an earlier act. Daniels v. Cityof Fort Smith, 268 Ark. 157, 594 S.W.2d 238 (1980). Finally, a general statute does not apply where there is a specific statute governing a particular subject matter. Donoho, supra. This principle would support enforcing the provisions of Act 84 of 1881, which more particularly addresses the issue of mandatory sewer connections.
[4] The legislative history does not reflect what prompted the General Assembly to draw a distinction charging those making voluntary hookups with the proportional cost of initial capital construction while not imposing this cost on those making mandatory hookups. However, I will opine that this distinction would withstand a constitutional challenge based on the doctrine of "equal protection," which arises out of the 14th amendment to the U.S. Constitution and Article 2, §§ 2 and 3 of the Arkansas Constitution. The equal protection doctrine prohibits certain types of "classifications." A classification is the disparate treatment of those who are similarly situated. However, classifications in and of themselves do not violate the equal protection doctrine. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class or a fundamental right, it is necessary to show that the disparity is arbitrary. The disparity must be shown to have no rational basis — i.e., no possible rational relationship to a legitimate governmental end. Vacco v. Quill, 521 U.S. 793 (1997);Romer v. Evans, 517 U.S. 620, 631 (1996); Clements v. Fashing,457 U.S. 957 (1982); Craft v. City of Fort Smith, 335 Ark. 417,984 S.W.2d 22 (1998). In the present case, the legislature may have been motivated to draw the distinction based on the reasoning that an individual or business that exploits the city's sewer services without correspondingly benefiting the public by remedying an existing health hazard should be charged his proportional share of the cost of the infrastructure. By contrast, the legislature may have considered the public policy interest in remedying existing health hazards so strong that it determined to require the sources of such hazards to hook up to the system at no cost other than the cost of connection.