OPINION
This case involves the validity and application of Chapter 127, Session Laws of 1931, now Chapter 87, W.R.S. 1931, and Chapter 51, Session Laws of 1933, Special Session. These are the power district laws of the State of Wyoming and will be referred to in this opinion as the 1931 act or law and the 1933 act or law.
Seventy-three freeholders of Sheridan County filed a petition in the District Court of Sheridan County praying for the organization of the Sheridan County Power District under the provisions of the laws above *Page 371 
mentioned. It was proposed in the petition that the power district should be co-extensive with the boundaries of Sheridan County, should include the city of Sheridan, and that the power district to be created should purchase the Sheridan County Electric Company, a corporation, the company now furnishing light and power to the city of Sheridan and outlying territory, it being alleged that said company is a subsidiary of and owned by Federal Light and Traction Company, which company has been ordered by the United States Securities and Exchange Commission to dispose of its interest in the Sheridan County Electric Company. It is further alleged that it is desirable and necessary that the electric company be sold to the proposed district rather than to an outsider so that the consumers of electricity shall receive the benefit of lower electric rates than can and will be furnished by public ownership of the light plant. No Certificate of Necessity from the State Public Service Commission was attached to the petition as the 1931 law requires because, as the petition alleges, it is not intended to construct a new or competing system but to acquire an existing system, and, further, because, under the 1933 law, it is alleged no such certificate is required. It is also alleged that the names of all freeholders in said proposed district are not attached, to the petition, as required by the 1931 law, because this is not necessary where only revenue secured bonds are to be issued which will not constitute a lien on the lands in the district. After alleging the intention of the district to cooperate with the United States and the State of Wyoming in every way possible, it is alleged that the bonds proposed to be issued will be a lien only upon the plant and equipment and upon the revenue derived from operating the plant.
Upon the filing of this petition the court set the matter down for hearing on July 24, 1944, and caused notice *Page 372 
to be published. The two respondents were the only objectors to the petition. The Board of County Commissioners of the county and the city by its Mayor and Commissioners joined in the petition. The objections to the granting of the petition were generally upon constitutional grounds and also that the law under which the district was proposed contemplates only rural electrification and not the furnishing of electricity to cities, and that the plan if carried out would be generally detrimental to the citizens.
The District Court at the hearing of the petition denied the same on many grounds, holding that the 1933 act was unconstitutional in several respects; that there was no authority granted by the acts in question to acquire an electric light plant such as the Sheridan County Electric Company; that the acts do not authorize the inclusion of a city within a district formed thereunder; that no sufficient necessity for the creation of the power district appeared; and that no certificate of necessity from the Public Service Commission of Wyoming was obtained and attached to or accompanied the petition, as required by the 1931 act. Regarding this latter finding, after the matter came on for hearing and was concluded, the petitioners asked leave to reopen the case for the purpose of introducing the findings and order of the Public Service Commission. This was allowed and an order of the Commission denying the application for a certificate was introduced. The order of the Commission recited that the application was made by the Sheridan County Power District proposed; that a necessity exists for someone to take over the Sheridan County Electric Company, as it has been ordered sold, so as to furnish electricity to the consumers now being supplied, but that the Sheridan County Power District has no existence, is merely a proposition not created, and that no financial statement accompanied the application of the power district. It *Page 373 
might be well to state at this point that Section 1 of the 1931 act seems to require that the application for a certificate from the Public Service Commission should be made, not by the proposed district, which, of course, has no legal entity until created by the court, but by the signers of the petition for the creation of the district, the statute providing that when a majority of the freeholders on lands, etc., which desire to provide for the purchase of electric power, etc., "they shall procure a certificate of necessity from the Public Service Commission of the State of Wyoming" and attach such certificate to their petition. Apparently the chief reason assigned by the Commission for refusing the certificate was that the applicant, the proposed district, was not in being, although the Commission also assigned as a reason that no financial statement accompanied the application and that the application was premature. If the Commission meant, by holding the application premature, that no certificate will be issued to anyone until the power district has been legally formed by the judgment of the District Court, then it would in all cases be impossible to comply with the statute providing for such districts. Under Section 94-145, W.R.S. 1931, as amended by Chapter 28, Session Laws of 1937, it seems to be the duty of the Commission to be satisfied of the financial ability of the applicant before issuing the certificate. Had the application been made by the signers of the petition, it may be the certificate would have been issued. However, this is merely conjecture.
At this point it may be well to state what we consider the proper method of interpreting the two statutes in question, the 1931 and the 1933 acts, when applying them to any given situation. It seems to us that the 1933 statute by its terms answers that question. Section 3 of that act provides: "It shall be construed as cumulative authority for the purposes named in Sections 1 and 2," these being the sections concerning the *Page 374 
issuance of revenue bonds, "and shall not be construed to repeal any existing laws with respect thereto, it being the purpose and intention of this act to create an additional and alternate method for the purposes herein named."
It is a well established rule of law that a statute giving additional or different powers or privileges does not repeal any part of a former statute on the same subject unless the latter clearly evinces a purpose so to do. See note 88, American State Reports, page 271; 59 C.J. 918; 50 American Jurisprudence, 556; and Bliler vs. Boswell, 9 Wyo. 57, at 78; 59 P. 798. It therefore appears that the two acts must be read together as though passed as a single act.
As heretofore stated, the District Court held against the petition for several reasons, holding the statute of 1933 unconstitutional on many grounds. However, we do not think it will be necessary for us to pass upon the constitutional questions raised in the court's findings and conclusions.
It is said in Volume I, Cooley's Constitutional Limitations, 8th Edition, at page 388:
"Neither will a court, as a general rule, pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause."
It is well settled, of course, that when a case can be completely and effectively disposed of without passing on a constitutional question, the courts will not pass upon such matter. We think this case can be so disposed of.
We shall in this opinion pass upon three of the conclusions reached by the trial court and shall at least touch upon the fourth. The trial court found "the petition herein filed states that it is the purpose of the incorporation *Page 375 
of such district to acquire through purchase the plant, equipment and property of the Sheridan County Electric Company, but there is no authority contained in either Chapter 87 or Chapter 51 aforesaid or in any other law of the State of Wyoming for the acquisition of such properties by this district."
The court also found that "the attempt to create this proposed district and to include within its boundaries the incorporated city of Sheridan is illegal and invalid in that there is no authority in either Chapter 87 or Chapter 51 aforesaid to include an incorporated municipality within the boundaries of a district created thereunder."
The court further found, "That although it is necessary before the proposed district shall be created, that a certificate of necessity therefor shall be obtained from the Public Service Commission of Wyoming, the said Commission has refused to issue such certificate."
The other proposition that we shall discuss is the finding of the court "that no sufficient necessity for the creation of the power district appears."
This last finding of the trial court will be discussed first. Appellants say in their brief that the trial court was not required to make a finding on the necessity of the district until after the district had been created and the approval of the issuance of the bonds is requested. The 1931 statute, the only one touching upon the question of what shall be contained in the petition, except the matter of whether the bonds when issued shall be revenue bonds as provided in the 1933 law, requires that the petition shall include "the necessity of the proposed work, describing the necessity," etc. Section 5 of the same act provides that upon the hearing of the petition for the purpose of determining whether the court will approve the proposition and order the district formed, objectors may appear and contest *Page 376 
or object to . . . (5) the inclusion or exclusion of any lands in the district or any other material issue raised by the petition." The statute then provides in the same section that upon the hearing, the court shall hear and determine all issues provided in this section. It would seem that since the question of necessity must be alleged in the petition and the court shall pass upon all material issues raised by the petition, the court must pass on the question of necessity.
Appellants claim that even if it was proper for the trial court to make a finding as to the necessity of the organization of the power district, nevertheless the word "necessity" should be construed to mean no more than "expedient," "convenient," or "useful to the public." That contention seems to be correct under many decisions. A few of the cases passing upon the meaning of the word "necessity" when applied to a public utility will be quoted from.
In Wisconsin Telephone Co. vs. Railroad Commission,162 Wis. 383, 156 N.W. 614, it is said:
"It (the word `necessity') has been generally held to mean something more nearly akin to convenience than the definition found in standard dictionaries would indicate. Inconvenience may be so great as to amount to necessity. A strong or urgent reason why a thing should be done creates a necessity for it. The term is relative rather than absolute. No definition can be given that would fit all statutes in which the word has been used."
The Supreme Court of Illinois in Aurora and C. Railway Co. vs. Harvey, 178 Ill. 477, 53 N.E. 331, held that:
"The word `necessary' should be construed to mean `expedient,' `reasonably convenient,' or `useful to the public,' and cannot be limited to an absolute physical necessity." *Page 377 
The Supreme Court of Minnesota in C. N.W. Ry. Co. vs. Verchingel, 197 Minn. 580, 268 N.W. 2, at page 6, says:
"The word `necessity' is not used in its lexicographical sense of indispensably requisite. If it were, no certificate of public convenience and necessity could ever be granted. The necessity to be provided for is not only the existing urgent need, but the need to be expected in the future, so far as it may be anticipated from the development of the community, the growth of industry, the increase in wealth and population, and all the elements to be expected in the progress of the community. The convenience of the public must not be circumscribed by according to the word `necessity' its lexicographical meaning of an essential requisite."
In San Diego Coronado Ferry Co. vs. Railroad Commission of California, 210 Cal. 504, 292 P. 640, the court, among other things, said:
"However, any improvement which is highly important to the public convenience and desirable for the public welfare may be regarded as necessary. If it is of sufficient importance to warrant the expense of making it, it is a public necessity. A thing which is expedient is a necessity. Inconvenience may be so great as to amount to necessity. A strong or urgent reason why a thing should be done creates a necessity for doing it. The word connotes different degrees of necessity. No definition can be given that would fit all statutes. The meaning must be ascertained by reference to the context, and to the objects and purposes of the statute in which it is found."
The Supreme Court of Illinois, in Wabash, C. W. Ry. Co. vs. Commerce Commission, 309 Ill. 412, 141 N.E. 212, at page 214, has this to say:
"When the statute requires a certificate of public convenience and necessity as a prerequisite to the construction of a public utility, such as a railroad, the word `necessity' is not used in its lexicographical sense of `indispensably requisite'; but an improvement of sufficient importance to warrant the expense of making *Page 378 
it, or a thing which is expedient is a necessity, and inconvenience may be so great as to amount to necessity."
There are other cases along the same line. With the word "necessity" interpreted as in the excerpts from the above cited cases, an interpretation that we accept, the question arises whether, under the circumstances of this case and under the evidence, the court was bound to find that the necessity existed.
The writer of this opinion "does not choose" to answer that question, because the case can be disposed of on other points. What we say about this matter is our own opinion and does not represent the opinions of the other members of this court. It seems to the writer of this opinion that it is unfortunate that the law requires the trial court to pass upon more than the feasability or workability of the plan presented, if the word "necessity" should be interpreted to mean more than that. If people in rural communities wish to electrify their homes and buildings and are willing to pay for doing that, it would seem that the trial court should not have the right to say that such electrification is not a necessity. Of course, coal-oil lamps and lanterns are still available.
The 1931 power district law seems to be modeled after the irrigation district law of the state. It follows that law quite closely. Yet in the irrigation district law there is no requirement that the court pass on the necessity of the district. That is something added to the power district law and leads to uncertainty and confusion. A finding of the necessity for a power district where it is proposed to issue revenue bonds, and especially where it is proposed to include a city in the district, might depend very largely on the opinion of the judge trying the case as to the desirability of municipal ownership of a light plant financed by revenue *Page 379 
bonds. A judge who is opposed to municipal ownership and operation of a light plant, and who thinks that the old-fashioned bond which is a lien on real property is the only proper bond that should be issued, might very well hesitate to find any necessity for a proposition that included municipal ownership and revenue bonds; while one who is more liberally constituted and is favably inclined toward municipal ownership of light plants and revenue bonds to finance their acquisition would, we think, be apt to arrive at an opposite conclusion on the question of necessity. The other members of this court may wish to express a different view on this question and hold that there is no evidence in this case by which the court could say that the trial court's finding on the question of necessity is erroneous. The writer of this opinion expresses no opinion on that except what is said above.
On the question of its being required to obtain a certificate of necessity from the Public Service Commission of Wyoming and attaching the same to the petition, appellants contend that since the 1933 law says nothing about a certificate of necessity from the Public Service Commission, and since the purpose and intention of the proposed power district in this case is to take over an existing plant and not to construct a new one, no such certificate should be required in this case. The Public Service Commission apparently took the view that the proposition of forming the district has not gone far enough to justify such certificate, and it may be, as contended by appellants, that no such certificate should be required until the district is in existence and the commissioners appointed by the court under Section 9 of the 1931 law have made their report showing just what is proposed to be done. But unfortunately these are questions that should be addressed to the Legislature and not to the court. The 1931 law is the one that sets out what the petition shall *Page 380 
contain, except the matter of issuing revenue bonds. The 1933 law in its first section at the very beginning says, "If the petition for the organization of a power district under Section 87-101, Wyoming Revised Statutes, 1931 (which is the 1931 law in question) states," etc., thus showing that the 1933 law contemplates that the petition should be filed under the 1931 law. The 1933 statute makes no provision as to the contents of the petition, except as to the kind of bonds that are to be issued. It makes no provision for a hearing nor for a court order organizing the district. It makes no provision for the appointment or election of district commissioners. In fact, the whole procedure in forming a district is provided for under the 1931 law except as to the matter of the issuance and sale of the bonds. The 1931 law is the one we must look to to ascertain the procedure that must be followed in the formation of a district. Hence we do not believe we would have a right to say that the requirement of a certificate of necessity from the Public Service Commission is unnecessary. Had the Legislature intended to waive that requirement when the bonds are to be revenue bonds, it would have been an easy matter to say so. Appellants say in their brief, "Chapter 87 and 51 (the two statutes in question) comprise a complete and carefully considered legislative enactment."
As heretofore stated, the trial court found that no authority exists by virtue of either the 1931 nor the 1933 acts for the acquisition through purchase by a power district formed thereunder of the property of the Sheridan County Electric Company, and further that no authority exists under either or both of said acts to include within a power district an incorporated municipality. We think both these findings are correct.
We cannot see that the 1933 act confers any power upon a district not conferred by the 1931 act except *Page 381 
the power to issue revenue bonds which shall constitute a lien only upon the electrical equipment used by the district and upon the revenue derived from the sale of electricity. The 1933 act does not grant power to the district to purchase a power plant except, perhaps, inferentially. It speaks of a lien upon the power plant, distribution system and other property used in the manufacture of electric energy, but nowhere confers power to acquire any such property. In fact, it states in the last sentence of the act that any such power system or plant, electric light plant, power plant, etc., shall be the property of the State of Wyoming. It may be doubtful if a lien could be created on property that does not belong to the district. Too, the title of the act is "An act to enable power districts to issue revenue bonds, and abbreviating the procedure for organization of revenue bond power districts." Nothing is said in the title as to any additional powers except to issue revenue bonds. The act provides in Section 3 that it shall be construed as cumulative authority for the purposes named in Sections 1 and 2 thereof and as to the manner and form of issuing revenue bonds for any such purpose or purposes, and shall not be construed as repealing any existing laws with respect thereto, it being the purpose and intention of the act to create an additional and alternate method for the purposes herein named. We think when the title of the act is read in connection with the body of the section, it is apparent that the only purpose of the 1933 law is to change the method of issuing bonds, allowing them to be issued so that they shall not be a lien on the lands of the district but only on the electrical equipment and revenues, and also reducing the number of signers necessary on the petition where revenue bonds are to be issued from a majority of the freeholders on the lands in the contemplated district to fifty such freeholders. But when it comes to a question of the powers of a district when *Page 382 
formed, we must look to the 1931 law where Section 9 specifically sets forth the powers that may be exercised by the district when the court approves the petition. Those powers are "to build or otherwise require (sic) power lines and the transformers and other electrical equipment necessary to connect with power lines of the United States, the State of Wyoming, or any subdivision thereof to transmit power to any and all persons deciding to use the same." Nothing there about acquiring, owning or operating an electric light plant or manufacturing electrical energy. Section 12 of the 1931 act on the subject of corporate authority of the commissioners, who are the governing body of the district, provides that the board shall have power to purchaseelectric current and to purchase, construct or otherwise acquire power lines, transformers and other equipment necessary toconduct and transmit such electric current to various people of the district who desire to use it. Nothing there about manufacturing electricity.
Section 13 of the 1931 act provides, among other things, that, upon their appointment, the commissioners shall file a report in the district court showing the extent and character of the proposed work, what lands are to be included in the district, the injury to and benefit to such lands, and the assessment against the latter (there would be no assessment if the petition were filed under the 1933 law), the total cost of the work, etc. Thereupon, under Section 14, the court sets the report down for hearing and the section requires that, in addition to a three weeks' publication of notice of the hearing, a copy of the notice shall be served on every person whose lands are included in the district, as a summons is served in a civil action. This requirement for service would indicate that it was not the intention of the Legislature to allow a power district to be formed co-extensive with the whole county and including *Page 383 
a city of the size of Sheridan in the district, because, if so included, then every landowner in Sheridan County, including every owner of a lot in Sheridan, would have to be served with a copy of the notice as a summons is served in a civil action.
These power district laws were passed by the Legislature at a time when the idea of rural electrification was being considered and urged throughout the nation. The Federal Power Commission was reorganized by Act of Congress in 1930 and its powers enlarged in 1935 so it was given control over all power sites on navigable streams and on United States public lands and reservations, and it was given power to construct and operate power projects and to regulate rates. Then, in 1935 the Rural Electrification Administration was created by executive order of the President and this was continued by the Rural Electrification Act of 1936, its purpose being to increase the use of electricity in rural communities. Also, there is the Electric Home and Farm Authority incorporated in 1935, authorized by Act of Congress to continue as an agency of the United States and to aid in distribution of electricity, etc., to homes on farms. We think, no doubt, that the 1931 act in question was passed for the purpose of taking advantage of the opportunities offered by these Federal agencies for rural electrification. The first section of the 1931 act requires the petition to state whether the petitioners desire to cooperate with the United States, the State of Wyoming, or any subdivision thereof.
Was it the intention of the Legislature to allow a power district to include a city within its boundaries? If so, then a district could be formed co-extensive with the boundaries of a city, and under the 1933 act a district so formed could issue revenue bonds to buy or build an electric power plant. Yet we know that the *Page 384 
proposition of allowing cities to acquire public utilities by the issuance of revenue bonds has been before the State Legislature many times and each time, with the exception of the 1935 Act hereafter mentioned, the Legislature has refused to pass such a bill. We cannot take judicial knowledge that each time such a bill has been introduced many gentlemen, who happen to be attorneys for or otherwise connected with electric light and gas companies, have happened to be in the Capitol City when such bills have been up for consideration; nor could we take judicial knowledge that their motives have not been in the interest of the taxpayers of Wyoming. But we do know that in 1935, 1937, 1941, 1943 and 1945, bills were introduced to allow cities to issue revenue bonds and each time such bills were defeated.
During these many years when attempts were being made to authorize cities to issue revenue bonds, such bonds were well known to anyone who took the trouble to look into the question. It was not as though some legislator were attempting to have authorized a new and untried thing. Such bonds have been in use successfully for nearly a half-century. Some thirty states allow their use by cities or other political divisions of the state. Wyoming, since 1935, has allowed revenue bonds to be issued to construct and improve sewerage systems. Session Laws of 1935, Chapter 75.
In the case of Utah Power Light Co. vs. Ogden City, 95 Utah 161,79 P.2d 61, at page 66, decided in 1938, it is said:
"We are earnestly urged to reconsider and repudiate the special fund doctrine of our previous decisions. We have no disposition to do so. The principles upon which it rests have been repeatedly examined by this court. It is now firmly established and supported not only by our own repeated decisions, but by the overwhelming weight of authority in our sister states. A citation of many of these will be found in our previous decisions, *Page 385 
supra. We can allot space for but a few of the more recent cases. Exhaustive citation would be impossible and unnecessary."
Then are cited cases from Alabama, Arkansas, Kentucky, Michigan, Montana, Nebraska, Ohio, Pennsylvania, South Carolina, Texas, West Virginia, Oregon, California, New Mexico and North Dakota. The court then goes on:
"The steady growth in recent years of the practice of financing by this method the purchase or construction of public utilities by cities and towns, as denoted by increasing and now general recognition and approval of the special fund doctrine by the courts, affords persuasive, indeed convincing, evidence of its soundness and utility. As such, it is peculiarly in the public interest. Because of the fact that most cities and towns are so largely indebted that they cannot acquire and pay for expensive utilities out of their general revenues, or by bonds within their constitutional limits of debt, the special fund rule affords the only means of relief from helpless dependence upon an exclusive private market. Their situation is comparable to that of a tenant who, after paying rent for the use of a hired house for many years, awakes to the realization that he has already paid enough money to his landlord to have bought and paid for a home of his own. So moves into another house under a contract of purchase by which his monthly payments, no larger than before, gradually liquidate principal and interest of his purchase price and his payments cease."
See also note in 96 A.L.R. 1385.
We think, therefore, that it would be illogical and, to say the least, peculiar for this court to hold that a city may form a power district and thus issue revenue bonds under the 1933 act, when, since 1936, the Legislature has steadfastly refused to authorize cities to issue that kind of bonds for electric light purposes. We think the whole purpose of the 1931 and 1933 acts was to provide a method by which rural communities could acquire electric light and power by community action. *Page 386 
We conclude, therefore, that the trial court was correct in its holding that, under the law as it now exists, a power district does not have authority to purchase a city electric light plant and issue revenue bonds for the payment thereof, nor to include a municipality within the district. We further hold that under the law as it now exists it is necessary to obtain from the Public Service Commission of the State of Wyoming a certificate of convenience and necessity before the power district proposed can be formed on order of the District Court.
For the reasons stated, the judgment of the trial court is affirmed.
Affirmed.
BLUME, C.J., and RINER, J., concur.